# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| JOANNE BURROW, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case number 4:09cv2073 TCM** |
| | ) | |
| THE BOEING COMPANY, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This employment discrimination action is before the Court[1] on the motion of defendant, The Boeing Company (Boeing), for summary judgment; the motion of pro se plaintiff, Joanne Burrow, for leave to file a sur-reply or, alternatively, to strike two affidavits submitted by Boeing; and the motion of Boeing to strike Plaintiff's response to its statement of undisputed facts. Each motion is vigorously opposed.

## Background

The complaint, filed in state court and removed to federal court on federal question and diversity grounds, reads in its entirety as follows.

(1) I was employed at the Boeing Company from 1990 to September 7, 2007. I was hired by Boeing as a secretary. My most recent job before termination was a logistic specialist.

(2) During my employment, I complained about discrimination, most recently in 2006. On September 7, 2007[,] I was discharged. July 2006 I was written up and suspended. July 27, [20]06[,] I was suspended for spending too much

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

time on an organization approved project/work.  On September 22, [20]06[,] I was given a written warning for sending an email after I left work.  On Feb[ruary] 21, [20]07[,] I was suspended for attendance while on FMLA, and 4/20/07 I was given a warning that I would be fired if I committed any act listed on the warning.  Prior to 2006 I had no disciplinary problems and for actions [sic].

I believe I was disciplined and suspended due to my race (Afr.Amer) my sex (female) and disability (illness).

As remedy, I seek removal of the discipline and termination from my file.  Restitution for loss of wages and insurance.  Restoration of my employment.

(Compl. at 1-3.)

This complaint followed a charge of discrimination written and filed by Plaintiff with the Missouri Commission on Human Rights in June 2008.  (Def. Mot. Ex. 1, Pl. Dep., at 64; Def. Mot. Ex. 13.)  The earliest date of discrimination was September 7, 2007; the latest was September 7, 2007.  (Def. Mot. Ex. 13.)  For the basis of discrimination, Plaintiff checked the boxes labeled "Race," "Retaliation," and "Age."  (Id.)  She did not check the boxes labeled "Color," "Sex," "Religion," "National Origin," "Disability," or "Other."  (Id.)  The particulars of her charge are as follows.

On or about April 30, 1990, I was hired by [Boeing] as a secretary.  My most recent job title was as logistic specialist 2.  During my employment, I complained about discrimination, most recently in 2006.  On or about September 7, 2007, I was discharged.

On or about September 7, 2007, my supervisor, Ed Floretta informed me that I was discharged because I violated the PIP [performance improvement plan] and because of my performance.

I believe that I have been discriminated against because of my race, African American, and in retaliation for complaining, in violation of Title VII of the

Civil Rights Act of 1964, as amended; and because of my age, 56, in violation of the Age Discrimination in Employment Act.

(Id.)

The earliest incidence of discriminatory discipline cited by Plaintiff is a July 2006 suspension. Before this suspension was imposed, Plaintiff's statement was taken. (See Def. Mot. Ex. 5.) She reported that she had not been told she could not engage in any affinity group[2] activities during the workday. (Id. at 1.) She continued, in part:

> Over the last 2[3] months, I've spent an average of 35% of my workday attending to several groups; primarily AES [Amelia Earhart Society] and Toastmasters.[4] . . . As my workload decreased (which is [sic] has) I have increased some of this activity.
>
> There have been occasions that when I've found that I spent too much of my work time engaged in these other activities, I use a vacation day instead of charging regular time. I realize that I should have approval before using vacation, but these were unusual circumstances. There have been times that I asked for vacation ahead of time as well.
>
> . . .
>
> Although I have not read the PROs regarding affinity groups and clubs, I am generally aware that management approval is required to attend to these activities during the workday. I am also aware that proper charging practices need to be followed. Since I have not let these activities interfere with my work, I have not found it necessary to seek management approval; and since

---

[2]Neither party explains what an affinity group is.

[3]A typed "3 to 4" was crossed out and a "2" was written in by hand followed by the initials "JTB." Plaintiff's middle initial is "T."

[4]Plaintiff testified in her deposition that Toastmasters is a public speaking group. (Def. Mot. Ex. 1, Pl. Dep., at 197.) The work she was doing for that group was part of a college communications class she was taking. (Id.) She testified that she had received permission to take the class. (Id.)

I occasionally engage in work activity at home, I did not feel that time charging was an issue.

(Id. at 1-2.)  In her deposition, Plaintiff explained that she did not "have any clue about how much time" she was spending on the affinity group because Boeing was then on "down time" and there was no work.  (Def. Mot. Ex. 1, Pl. Dep., at 54.)  It was not, however, 35%.  (Id.)  Plaintiff was suspended for five days for failure to comply with management instructions and to report her time accurately.  (Def. Mot. Ex. 6.)  In the Corrective Action Memo (CAM) notifying her of the suspension, she was informed that she was "expected to work a set schedule with a start time of 7:30 a.m."[5]  (Id.)  Flex time was to be approved before taken.  (Id.)

Plaintiff believes that the suspension was due to her race because other people were doing what she was doing and did not get suspended.  (Def. Mot. Ex. 1, Pl. Dep., at 185.)  Specifically, a Hispanic woman was working on another affinity group and was not suspended.  (Id. at 186.)  She also thought it was due to her disability because Floretta did not like it that she had diabetes.  (Id. at 187.)  Her disability is a bad back and diabetes.  (Id. at 188.)  In her deposition, Plaintiff recalled the basis for her 2006 discrimination complaint, the one cited in her pending complaint, as being suspended for spending time on AES when another, Hispanic lady in the same area did so also but did not get disciplined.  (Def. Mot.

_____

[5]Plaintiff testified in her deposition that she did not remember what her schedule was before the November 2006 PIP.  92-93

Ex. 1, Pl. Dep., at 50, 52.)  There were no comments made to Plaintiff about her race.  (<u>Id.</u>)

The Hispanic lady worked for a different manager.  (<u>Id.</u> at 55-57.)

On November 9, 2006, Plaintiff filed seven EEO complaints.  (Def. Mot. Ex. 15.)  In

the first complaint, she explained that she meant to cross out the reference to 35% in her July

statement, that she had told the investigator that the percentage was wrong and overstated the

amount of time she spent on group activities, which she had never been told by her manager

she could not do on company time, and that the woman who sat across from her, Kathy

Diamond, did college homework on company time.  (<u>Id.</u> at [4].)  She testified in her

deposition that Diamond had been doing her homework at work for six months and that

everybody knew it "[b]ecause she would sit there with her homework out." (Def. Mot. Ex.

1, Pl. Dep., at 197.)  She further alleged that the Boeing Human Resources (HR) Department

was "largely responsible for much of the retaliatory acts and discriminatory behavior that

ha[d] been directed against [her] over the past 3 years up to the present." (Def. Mot. Ex. 15

at [5].)  Floretta had also harassed her.  (<u>Id.</u>)

This retaliation, discrimination, and harassment were also cited as the reason for a

second complaint challenging the denial of permission to send out "pride awards" to people

that had "done outstanding work for Boeing . . . ."  (<u>Id.</u> at [1].)  The only reason given by

Floretta for the refusal was the CAM.  (<u>Id.</u>)  The CAM was also given as the reason why she

could not do what other employees could.  (<u>Id.</u>)  She believes the refusal was because it was

coming from her.  (Def. Mot. Ex. 1, Pl. Dep., at 195.)

In her third complaint, Plaintiff challenged her placement on a set schedule with a start time of 7:30 a.m. (Def. Mot. Ex. 15 at [7]-[10].) This schedule was harmful to her health and was implemented, Plaintiff alleged, at the direction of Connie Stout who had a vendetta against Plaintiff and was retaliating against her. (Id. at [9].) Plaintiff further alleged that the issue of another employee, Beth Langraft, working at home when her children were present, against Boeing policy, had been raised by her at a meeting and that she had asked at that meeting for Floretta to help her with the Employee Timekeeping System (ETS). (Id. at [7].)

Her time schedule and the harm to her health were also the focus of Plaintiff's fourth EEO complaint. (Id. at [11]-[14].)

Her requests to Floretta for help with ETS were one of the subjects of Plaintiff's fifth complaint. (Id. at [15]-[17].) Also noted was his angry reaction to her response when he told her she was late a few times that he was coming in to work the same time as she was. (Id. at [15].) This incidence had occurred in October 2006. (Id.) Plaintiff testified in her deposition that there were times when she did not enter her time in the ETS in the timely fashion required. (Def. Mot. Ex. 1, Pl. Dep., at 207-08.)

In her sixth complaint, Plaintiff challenged a verbal warning given her by Floretta on September 22, 2006, for sending out an email to AES. (Def. Mot. Ex. 15 at [18]-[20].) She attributed this warning primarily to a personal vendetta against her by a Carol McClellan and the Boeing HR Department. (Id. at [19].) She concluded that Boeing upper management was using Floretta to "inflict unjust punishment on [her]." (Id.)

In the seventh of her complaints, Plaintiff took issue with being "repeatedly" summoned to HR "to answer false allegations." (Id. at [21]-[23].)

A few days after Plaintiff made her complaints, she was issued a PIP. (Def. Mot. Ex. 9 at [1].) Three areas for improvement were listed; the first two were of work schedule accountability and the third was reporting labor hours accurately. (Id.) The specific actions to be taken were to start work promptly at 7:30 a.m., end at 4:00 p.m., and take a one-half hour lunch; receive approval from her supervisor the day before "flexing time and/or changing work schedule"; not participate in private appointments or do non-work related activities during her work hours; accurately and daily record her time in ETS at the end of her shift; record her vacation time before the day she takes it; and update any temporary schedule to reflect any deviations from her permanent schedule. (Id.)

Plaintiff and other Boeing employees received an e-mail from Floretta in December 2006 about approval of vacation days, deviation from work schedules, and personal time off with pay. (Pl. Ex. 3.) Vacation days were to be pre-approved at least one day before. (Id.) Deviation from work schedules and personal time off also required his pre-approval. (Id.) At least one of the recipients of the e-mail, Larry Kendrick, apparently took time off in January 2007 with out prior approval. (Pl. Ex. 2.)

Plaintiff took eight hours of intermittent leave on January 8, 2007, under the Family Medical Leave Act (FMLA).[6] (Pl. Ex. 6.) Mark S. Krasnoff, M.D., was listed as the health care provider. (Id.)

On February 14, Plaintiff was assessed as not having made satisfactory improvement in any action in any of the three areas.[7] (Def. Mot. Ex. 10.) The following week, she was given a CAM and suspended for two days. (Def. Mot. Ex. 11.) The CAM included a reference to Plaintiff being "absent approximately 30% of the time" from November 13, 2006, to February 15, 2007. (Id.) Four weeks later, a follow-up discussion was held. (Def. Mot. Ex. 12.) A memorandum summarizing the discussion includes three areas of continuing problems with Plaintiff's job performance: reporting time daily and accurately; poor attendance; and performance. (Id.) The first included such allegations as failing to charge her time accurately after being asked to, causing Boeing to "make charging corrections with [its] government contractor," and failing to "load time into ETS" as instructed. (Id. at [2].) The second area included, among other things, not making up missed time, being late to

_____

[6]In her affidavit, Plaintiff characterizes this leave status as permitting her to be absent three or four times a week for 60 to 80 percent of the week and cites her Exhibit 6 in support of her position. (Pl. Aff. ¶ 27.) Exhibit 6 is composed of two pages. One is a January 15, 2007, e-mail to Floretta about Plaintiff's absence on January 8 and her application for intermittent FMLA leave for that date. The second page is a certification form apparently signed by Plaintiff on February 9, 2007, and by Dr. Krasnoff on February 12 requesting FMLA leave for appointments once or twice a month and health-related absences three to four times a week on a temporary basis. The first page does not refer to the requests in the second page, and no exhibit or other evidence purports to grant those requests.

[7]Plaintiff testified in her deposition that she could not remember seeing the February update. (Dep. at 162-63.)

meetings, and answering personal cell phone calls during meetings. (Id. at [2]-[3].) The third area included such allegations as missing deadlines and training sessions. (Id. at [3].)

Plaintiff submitted a note to Boeing from Dr. Krasnoff in March asking that she be allowed a flexible start time due to her insulin schedule and, if not, she be allowed to maintain the 7:30 a.m. start time. (Pl. Ex. 7.)

On August 28, Plaintiff fell at work.[8] (Pl. Ex. 8 at [1].)

Plaintiff's employment was terminated on September 7, 2007. The reasons given included failure to submit ETS forms as required; failure to accurately record her hours; and failure to maintain an expected level of performance. (Def. Mot. Ex. 1, Pl. Dep., at 208-09.)

In her affidavit in support of her response to the motion for summary judgment, Plaintiff avers that the CAMs, PIPs, and other adverse employment actions were caused by race discrimination and retaliation for her FMLA intermittent leave. (Pl. Aff. ¶ 35.) Asked during her deposition if she had identified any grounds for discrimination in her complaint other than sex, race, and disability, Plaintiff replied, "No. It is what it is." ( Def. Mot. Ex. 1, Pl. Dep., at 47-48.) Asked during her deposition if she had any evidence other than her belief that her race, gender, age, and disability played a role in the adverse actions, Plaintiff

---

[8]At one point in these proceedings, Plaintiff moved for leave to file an amended complaint to include a count for retaliation for filing a worker's compensation claim. Her motion read, in its entirety: "This is my motion to maned pleading to include workmen's compensation retailiation [sic]." (Pl. Mot., Doc. 18.) Noting that she had failed to submit a copy of the amended complaint or to otherwise clarify the allegations in such a complaint, the Court denied her motion without prejudice. Plaintiff did not pursue the issue.

relied that she did not.  (Id. at 59-60, 232-33.)  She had had documentation, but it was lost.

(Id. at 60.)

The following exchange during Plaintiff's deposition highlights the reliance Plaintiff

places on her beliefs that discrimination was at play in her suspensions and termination.

After she testified that Floretta treated her differently because of her race, Plaintiff was asked

what evidence she had to support her claim.  (Def. Mot. Ex. 1, Pl. Dep. at 141.)

> [Plaintiff]:  I don't have any evidence other than what I left at – on my computer at Boeing, the way he worded things to me that he didn't word to other people, the way he documented me, the way he had other people to – who were my peers to take notes on things that I was doing on a day-to-day basis whether I was in a meeting with our team or anywhere else.
>
> [Counsel]:  In any of that evidence, is there anything to suggest other than your own feeling that he was doing it based on your race and —
>
> [Plaintiff]:  Can you give me an example of what you mean?
>
> [This portion of the record was read back by the reporter.]
>
> [Counsel]:  [B]ased on your race, sex or disability.
>
> [Plaintiff]:  Okay.  You gonna give me an example of what you mean?
>
> [Counsel]:  Well, no, I'm not gonna give you an example.  I'm asking you for evidence.
>
> [Plaintiff]:  Well, what I asked you was to give me an example.
>
> [Counsel]:  . . . What – what evidence do you have?  You said that you've got some e-mails that were left back at Boeing, as I understand it, in which he was asking you for documentation, and you said the way he worded things and that he was asking people to take notes on you, correct?
>
> [Plaintiff]:  Yes.

[Counsel]: Okay. Other than those items, do you have any other evidence to suggest that there was discrimination involved in his treatment of you?

[Plaintiff]: I don't have anything in mind right now.

[Counsel]: Okay. So your claim that it was based on discrimination is more speculative than anything else; is that right?

[Plaintiff]: I wouldn't say that. I just don't recall it right now.

. . .

[Counsel]: Okay. You know, is there a person who is not African-American that he treated differently than you specifically?

[Plaintiff]: I'll have to think about that one.

[Counsel]: Okay. It sounds like you're basing your belief that this was discrimination on your feelings that it was due to the way you believe he was treating you; is that right?

[Plaintiff]: No, I don't think that's accurate, I really don't, because when you think about what he was doing, that is altogether, in my mind, when you treat me different from when you treat somebody else, then yes, that's discrimination. If you want to say it was black or if you want to say it was white, it was a gross, grossly – I was treated grossly different from others in that department.

[Counsel]: Okay. But you don't have anything concrete to suggest that it was racially motivated, gender motivated, disability motivated, or age motivated or retaliation motivated –

. . .

[Plaintiff]: He has said to me a couple of times, so it's your diabetes? You need to take another shot? Things like that. That was unnecessary.

(Id. at 141-44.)

As an example of what she perceived to be racial discrimination, Plaintiff had earlier described an occurrence when her request to attend a diversity conference in California had been denied and another black female employee supervised by Floretta was asked if she wanted to attend. (Id. at 61-62.) Plaintiff construed this as Boeing not wanting to look like it was singling out Plaintiff. (Id.)

## Discussion

"Summary judgment is . . . proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" **Torgerson v. City of Rochester**, 605 F.3d 584, 594 (8th Cir. 2010) (quoting Fed.R.Civ.P. 56(c)(2)). "The movant 'bears the initial responsibility of informing the . . . [C]ourt of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" **Id.** (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) (last two alterations in original). "If the movant satisfies its burden, the nonmovant must respond by submitting evidentiary materials that 'set out specific facts showing a genuine issue for trial.'" **Id.** (quoting Fed.R.Civ.P. 56(e)(2)). And "[i]n determining whether summary judgment is appropriate, [the] [C]ourt must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant." **Id.** Additionally, "[w]hile employment discrimination cases are often fact intensive and dependent on nuance in the workplace, they are not immune from summary judgment, and there is no separate summary

judgment standard for employment discrimination cases." **Fercello v. Cnty. of Ramsey**, 612 F.3d 1069, 1077 (8th Cir. 2010); accord **Smith v. Fairview Ridges Hosp.**, 625 F.3d 1076, 1082-83 (8th Cir. 2010).

In Plaintiff's charge of discrimination, she alleges discrimination based on race, retaliation, and age. In her complaint, she alleges discrimination based on race, sex, and disability. Each of the five claims of discrimination will be addressed in turn.

Race. Plaintiff alleges she was discriminated based on her race when she was suspended and then terminated from her employment with Boeing. Boeing contends that the adverse actions were motivated by her job performance.

Under the Missouri Human Rights Act (MHRA),[9] it is unlawful for an employer to, inter alia, "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, . . . ." Mo.Rev.Stat. § 213.055.1(1)(a). The safeguards under the MHRA against discrimination "are not identical to the federal standards and can offer greater discrimination protection."

---

[9]Neither party addresses the question whether Plaintiff brings her discrimination claims under federal or Missouri law. The only statute cited by Plaintiff in her pro se complaint filed in state court was the Family and Medical Leave Act (FMLA). In her charge of discrimination, she cited federal statutes. Plaintiff is proceeding pro se; thus, her pleadings are to be liberally construed. See **Johnson v. Arden**, 614 F.3d 785, 799 (8th Cir. 2010); **Wilson v. Stone Cnty. Jail**, 602 F.3d 920, 922 n.1 (8th Cir. 2010); **Earl v. Fabian**, 556 F.3d 717, 723 (8th Cir. 2009). Because the case was filed in state court and, as noted below, the Missouri Human Rights Act can "'offer greater discrimination protection,'" **Wierman v. Casey's General Stores**, — F.3d —, 2011 WL 1166706, *15 (8th Cir. 2011) (quoting Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 818-19 (Mo. 2007) (en banc)), the Court will construe her claims as arising under the MHRA where appropriate.

- 13 -

**Daugherty v. City of Maryland Heights.**, 231 S.W.3d 814, 818-19 (Mo. 2007) (en banc).

Specifically,

> [t]he MHRA defines "discrimination" to include "*any* unfair treatment based on race, color, religion, national origin, ancestry, sex, age as it relates to employment, disability, or familial status as it relates to housing." Section 213.010(5) (emphasis added). Nothing in this statutory language of the MHRA requires a plaintiff to prove that discrimination was a substantial or determining factor in an employment decision; if consideration of age, disability, or other protected characteristics contributed to the unfair treatment, that is sufficient.

**Id.** at 819. "Missouri courts define a 'contributing factor' as one 'that contributed a share in anything or has a part in producing the effect." **Wierman v. Casey's General Stores**, — F.3d —, 2011 WL 1166706, *15 (8th Cir. 2011) (quoting Williams v. Trans States Airlines, Inc., 281 S.W.3d 854, 867 (Mo. Ct. App. 2009)); accord **EEOC v. Con-Way Freight, Inc.**, 622 F.3d 933, 938 (8th Cir. 2010). The question before the Court then is whether there is a genuine issue of material fact that Plaintiff's race was a "contributing factor" in her suspensions and termination. See **Daugherty**, 231 S.W.3d at 820.

There is no direct evidence that Plaintiff's race was such a factor. "Direct evidence is that which shows a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding that an illegitimate criterion actually motivated the employment decision." **Daugherty**, 231 S.W.3d at 818 n.4; accord **Con-Way Freight, Inc.**, 622 F.3d at 936; **Torgerson**, 605 F.3d at 594. Such evidence "includes conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . ." **Daugherty**, 231

S.W.3d at 818 n.4.  See e.g. **Davison v. City of Minneapolis, Minn.**, 490 F.3d 648, 654 (8th

Cir. 2007) (citing as an example of direct evidence of race discrimination a statement by a

decisionmaker that he would not hire any black people if it were his company); **King v.**

**Hardesty**, 517 F.3d 1049, 1058-59 (8th Cir. 2008) (statement by decisionmaker to African-

American teacher "that 'white people teach black kids . . . better than someone from their

own race'" could be viewed as direct evidence in support of teacher's claim that her race was

a motivating factor in the school district's decision to exclude her from substitute teaching).

Such evidence does *not* include "'stray remarks in the workplace, statements by

nondecisionmakers, or statements by decisionmakers unrelated to the decisional process.'"

**Elam v. Regions Fin. Corp.**, 601 F.3d 873, 878 (8th Cir. 2010) (quoting Clearwater v.

Indep. Sch. Dist. No. 166, 231 F.3d 1122, 1126 (8th Cir.2000)).

Plaintiff testified in her deposition that no one had made any comments about her

race.  And, insofar as Plaintiff might argue that a lack of a genuine basis for the adverse

employment actions is direct evidence of race discrimination, such an argument is

unavailing.  See **McCullough v. Univ. of Ark. for Med. Scis.**, 559 F.3d 855, 861 (8th Cir.

2009) (disagreement with a decisionmaker about why an adverse employment action

occurred is not direct evidence of discrimination).

Plaintiff may also survive summary judgment by "'creating an inference of unlawful

discrimination under the burden-shifting framework established in McDonnell Douglas Corp.

v. Green, 411 U.S. 792 (1973).'"  **Elam**, 601 F.3d at 878.  See also **Wierman**, 2011 WL

1166706, *5 (applying *McDonnell Douglas* framework to MHRA claim of discrimination).

Under this framework, Plaintiff can establish a prima facie case "by showing that (1) [s]he is a member of a protected class; (2) [s]he was qualified for the position (sometimes articulated as meeting the employer's legitimate expectations); (3) [s]he suffered an adverse employment action; (4) under circumstances permitting an inference that the action was a result of unlawful discrimination." **Anderson v. Durham D & M, L.L.C.**, 606 F.3d 513, 520 (8th Cir. 2010); accord **Norman v. Union Pac. R.R.**, 606 F.3d 455, 461 (8th Cir. 2010).

Assuming, without deciding that Plaintiff has established a prima face case of race discrimination,[10] "the burden of production shifts to [Boeing] to articulate a 'non-discriminatory, legitimate justification for its conduct, which rebuts [Plaintiff's prima facie case.'" **Elam**, 601 F.3d at 879 (quoting Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 850 (8th Cir. 2005)). "If [Boeing] meets its burden, [Plaintiff] must 'produce evidence sufficient to create a genuine issue of material fact regarding whether [Boeing's] proffered nondiscriminatory reason is a pretext for discrimination.'" **Id.** (quoting Rodgers, 417 F.3d at 853). Plaintiff "has the burden of persuasion at all times." **Rodgers**, 417 F.3d at 850. See also **Hawks v. J.P. Morgan Chase Bank**, 591 F.3d 1043, 1050 (8th Cir. 2010) (outlining similar framework for MHRA claims).

---

[10]By assuming that Plaintiff has established a prima facie case, the Court avoids the "tension in [the Eighth Circuit's] jurisprudence regarding whether a court may consider an employer's reasons for discharging an employee when considering the qualified element of the prima facie case." **Elam**, 601 F.3d at 880 n.4.

Plaintiff began receiving disciplinary actions in July 2006. The first was a five-day suspension for allegedly failing to comply with management instructions and to report her time accurately. Plaintiff's statement to an investigator, taken before the suspension was imposed, revealed both knowledge of procedures to be followed when spending time at work on affinity groups and her unilateral decision that she need not follow these procedures.

Four months later, Plaintiff was placed on a PIP. The areas of improvement cited were similar to those at issue in July, i.e., reporting her time accurately and spending her time at work on work. Three months after that, in February 2007, she had reportedly been absent for 30% of the time and was continuing to not report her time correctly. She was also charged with missing deadlines and training sessions. Seven months later, she was fired. The reasons given were deficiencies in reporting and recording her time as required and not maintaining an expected level of performance.

Plaintiff contends that these proffered reasons are a pretext for race discrimination. She explained in her deposition that she felt that race is a factor when two people of different races who are doing the same thing but only one is suspended. (Def. Mot. Ex. 1, Pl. Dep., at 52.) Specifically, Plaintiff names three women – one Hispanic and two white – who committed similar infractions but were not disciplined. "'While [i]nstances of disparate treatment can support a claim of pretext, . . . [Plaintiff] has the burden of proving that she and [her coworkers] were similarly situated in all relevant respects.'" **Fairview Ridges Hosp.**, 625 F.3d at 1088 (quoting <u>King</u>, 517 F.3d at 1063) (all but third alteration in original). "'Employees are similarly situated when they are involved in or accused of the

- 17 -

*same offense* and are disciplined in different ways.'" **King**, 517 F.3d at 1063 (quoting

Wheeler v. Aventis Pharma., 360 F.3d 853, 858 (8th Cir. 2004)).  "This is a rigorous test to

meet."  **Id.**

The Hispanic lady[11] who allegedly also spent time at work on affinity groups worked

for a different manager than did Plaintiff.   "To prove discrimination based on

similarly-situated persons of another [race], however, 'the individuals used for comparison

must have dealt with the same supervisor, have been subject to the same standards, and

engaged in the same conduct without any mitigating or distinguishing circumstances.'"

**Hervey v. Cnty. of Koochiching**, 527 F.3d 711, 720 (8th Cir. 2008) (quoting Clark v.

Runyon, 218 F.3d 915, 918 (8th Cir. 2000)); accord **Betz v. Chertoff**, 578 F.3d 929, 934

(8th Cir. 2009).  Plaintiff has not satisfied the similarly-situated test with respect to the

Hispanic lady.

Nor has she satisfied it with respect to the two white women she names as being

similarly situated.  One, Kathy Diamond, allegedly did her homework on company time.

There is no evidence, however, that Floretta knew she was doing it.  Plaintiff's conclusion

that "everybody" knew is speculation.   See **Elam**, 601 F.3d at 881 (employment

discrimination plaintiff failed to show to other employees were similarly situated and not

similarly disciplined because she had not presented any evidence that the supervisors were

aware of the other employees' misconduct).  Moreover, Plaintiff was not suspended for

---

[11]Plaintiff could recall only her first name, Irene.  (Def. Mot. Ex. 1, Pl. Dep., at 53.)

merely spending time at work on an affinity group. She was suspended for failing to comply with management instructions and for not accurately reporting her time. Her deposition testimony that she had no idea about how much time she was spending on the affinity group reinforces the nonpretextual nature of the reasons given. See **Id.** (finding that two other employees were not similarly situated; although they had allegedly committed two of same acts as plaintiff had, plaintiff's other transgressions set her apart). See also **Norman**, 606 F.3d at 461 (8th Cir. 2010) (employees were not similarly situated when, although both were on long-term disability leave for similar illnesses, had history of reprimands, and white employee had also had lower performance evaluations, white employee had complied with company's instructions to submit return-to-work release and black employee had not); **Duello v. Buchanan Cnty. Bd. of Supervisors**, 628 F.3d 968, 974 (8th Cir. 2010) (rejecting plaintiff's claim of impermissible job discrimination supported, in part, by reference to an employee who was allegedly similarly situated; although employee had been more favorably treated than plaintiff, lack of relevant information made it impossible to meaningfully compare the two)

Another woman, Beth Langraft, allegedly worked at home when her children were present – conduct which Plaintiff contends was against company policy. Again, assuming, without deciding, that Plaintiff's allegation is accurate, it does not describe a similar infraction by a similarly-situated woman of a different race.

Boeing has come forward with evidence that Plaintiff was suspended then terminated because she failed to follow its rules on reporting her time and on how she was spending her time. Plaintiff may take issue with the accuracy of the charges, e.g., with exactly what percentage of her time she was spending on the affinity group, and with the rationale behind the rule, e.g., requiring that she obtain approval before taking a vacation day, but she offers no evidence of race discrimination other than her speculation. "'While [the Court is] required to make all reasonable inferences in favor of the nonmoving party in considering summary judgment, [the Court does] so without resort to speculation.'" **Torgerson**, 605 F.3d at 603 (quoting <u>Twymon v. Wells Fargo & Co.</u>, 462 F.3d 925, 934 (8th Cir. 2006)). Absent such speculation, Plaintiff has not established a genuine issue of material fact as to whether her race was a contributing factor to the complained-of employment actions. <u>See</u> **Anderson**, 606 F.3d at 522 (affirming grant of summary judgment to employer who might have been "quick to act" when terminating plaintiff but had not be shown to discriminate on impermissible basis); **McCullough**, 559 F.3d at 862 (affirming summary judgment in employment discrimination case in which plaintiff had argued that the decision to terminate him must have been based on discrimination because the proffered reason was "irrational"; the record in support of the challenged decision was not so sparse and the employer's conclusion was not so implausible as to create a genuine issue as to whether the employer's motivation was impermissible).

<u>Retaliation.</u>   Plaintiff alleges in her complaint that she complained about discrimination "most recently" in 2006.  In her charge of discrimination, she alleged that she had been retaliated against for complaining about race discrimination.  In her response to the pending motion, she avers that the retaliation was for taking intermittent leave under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2615.

Insofar as Plaintiff's complaint may be liberally construed to include an allegation that she was retaliated against for complaining about race discrimination, it is untimely.  If she meant to bring her claim under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e to 2000e(17), the charge had to be filed within 300 days of the occurrence.  <u>See</u> 42 U.S.C. § 2000e-5(e)(1).  If she meant to bring her claim under the MHRA, the charge had to be filed within 180 days of the occurrence.  <u>See</u> Mo.Rev.Stat. § 213.075(1).  She filed her charge in June 2008; she complained of discrimination in 2006 and was suspended in July 2006.  Regardless of whether her claim is under Title VII or the MHRA, the charge was untimely, as is her pending retaliation claim.[12]  <u>See</u> **<u>Holland v. Sam's Club</u>**, 487 F.3d 641, 643-44 (8th Cir. 2007).

Plaintiff also avers that she was retaliated against for her FMLA intermittent leave.

"'Under the [FMLA], an eligible employee is entitled to up to twelve weeks of unpaid leave during a twelve-month period [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'"  **<u>Scobey v.</u>**

---

[12]Plaintiff does not argue that the continuing violation doctrine saves her retaliation claims.  <u>See</u> **<u>United Air Lines, Inc. v. Evans</u>**, 431 U.S. 553, 561 (1977).

**Nucor Steel-Ark.**, 580 F.3d 781, 785 (8th Cir. 2009) (quoting Rask v. Fresenius Med. Care N. Am., 509 F.3d 466, 471 (8th Cir.2007)). "'A serious health condition is any illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider.'" **Id.** (quoting Phillips v. Mathews, 547 F.3d 905, 909 (8th Cir.2008)). "An FMLA retaliation claim alleges that an employer discriminated against an employee for asserting [her] rights under the act." **Wisbey v. City of Lincoln, Neb.**, 612 F.3d 667, 676 (8th Cir. 2010). "'Basing an adverse employment action on an employee's use of [FMLA] leave . . . is therefore actionable.'" **Id.** (quoting Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir.2002)) (alterations in original). If, as in the instant case, a plaintiff does not have direct evidence of retaliation, her FMLA retaliation claim is analyzed under *McDonnell Douglas* framework. **Phillips**, 547 F.3d at 912. Under this framework, "[Plaintiff] must show: (1) 'that she exercised rights afforded by the Act;' (2) 'that she suffered an adverse employment action;' and (3) 'that there was a causal connection between her exercise of rights and the adverse employment action.'" **Wisbey**, 612 F.3d at 676 (quoting Allen Health Sys., 302 F.3d at 832).

The only evidence relevant to Plaintiff's FMLA retaliation claim is her approved request for FMLA leave for eight hours in January 2007 and her February 2007 completed certification form.[13]

---

[13]There is no evidence whether Plaintiff was granted or denied FMLA based on the form. See note 6, supra.

"The kind of causal connection required for a prima facie case is not 'but for' causation, but rather a showing that an employer's 'retaliatory motive played a part in the adverse employment action.'" **Wisbey**, 612 F.3d at 676 (quoting Kipp v. Missouri Highway and Transp. Comm'n, 280 F.3d 893, 897 (8th Cir.2002)). The only evidence of a FMLA retaliatory motive is the timing. There are two adverse employment actions taken during the relevant time period. One is the February 2007 tracking of how Plaintiff was doing on a PIP issued two months before her eight-hour FMLA leave. See **Kasper v. Federated Mut. Ins. Co.**, 425 F.3d 496, 504 (8th Cir. 2005) ("Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation."). The next adverse action, her termination, was taken seven months after she completed the certification form. "'Generally, more than a temporal connection . . . is required to present a genuine factual issue on retaliation,' and 'mere coincidence of timing can rarely be sufficient to establish a submissible case of retaliatory discharge.'" **Wisbey**, 612 F.3d at 676 (quoting Kipp, 280 F.3d at 897) (alteration in original) (holding that *one month* difference was insufficient to establish submissible case). See also **Kipp**, 280 F.3d at 897 (as a matter of law, interval of two months fatally "dilute[d] any inference of causation").

Age. Plaintiff alleged in her charge of discrimination that she was fired because of her age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621-634. In her complaint, she did not allege age as a basis for the complained-of

discrimination.  It is abandoned.  <u>See</u> **Wilson v. Shinseki**, 2010 WL 2008851, *1 n.1 (E.D. Mo. 2010) (ADEA claim mentioned in charge of discrimination but not in complaint was abandoned); **Johnson v. Unilever Home & Personal Care, USA**, 2003WL 21911075, *3 n.1 (E.D. Mo. 2003) (claim of race discrimination alleged in charge of discrimination and not in complaint was abandoned).

<u>Sex.</u>  Conversely, Plaintiff alleged in her complaint she was suspended and terminated because of her sex but in her charge of discrimination did not allege sex as a basis for the discrimination.

As noted above, under either Title VII or the MHRA, a plaintiff must exhaust her administrative remedies by filing a charge of discrimination before filing suit.  <u>See</u> 42 U.S.C. § 2000e-5(f); Mo.Rev.Stat. §§ 213.075, 231.111; **Tart v. Hill Behan Lumber Co.**, 31 F.3d 668, 671 (8th Cir. 1994).  To satisfy this exhaustion requirement, "[t]he information given in a[] . . . charge [of discrimination] must be sufficient to give the employer notice of the subject matter of the charge and identify generally the basis for a claim, but it need not specifically articulate the precise claim or set forth all the evidence an employee may choose to later present in court."  **Wallace v. DTG Operations, Inc.**, 442 F.3d 1112, 1123 (8th Cir. 2006) (Title VII case); **Alhalabi v. Mo. Dep't of Natural Res.**, 300 SW.3d 518, 525 (Mo. Ct. App. 2009) (MHRA case).  There is, however, a difference between "'liberally reading a claim which lacks specificity, and inventing, ex nihilo, a claim which simply was not

made.'" **Cottrill v. MFA, Inc.**, 443 F.3d 629, 634 (8th Cir. 2006) (quoting Parisi v. Boeing Co., 400 F.3d 583, 585 (8th Cir. 2005)).

In her charge of discrimination, Plaintiff alleged that she was discriminated against because of her race and age. She did not mark the box labeled "Sex" as a basis for discrimination and did not include any factual allegations relevant to such a claim. There is nothing in the charge to put the administrative agency or Boeing on notice that Plaintiff was also alleging sex as a basis for discrimination. Indeed, other than her belief, Plaintiff has no evidence that it was so.

Her claims of sex discrimination are dismissed. See **Fair v. Norris**, 480 F.3d 865, 867 n.2 (8th Cir. 2007) (dismissing claim of sexual harassment on grounds that plaintiff had not exhausted administrative remedies "[g]iven lack of any apparent relationship between [plaintiff's] allegations of sexual harassment . . . and the basis of her complaint [of racial discrimination] to the EEOC"); **Bainbridge v. Loffredo Gardens, Inc.**, 378 F.3d 756, 760 (8th Cir. 2004) (finding that plaintiff had failed to exhaust his Title VII administrative remedies on his retaliation claim when he had not checked the box next to "Retaliation" on the charge form and did not allege any facts connecting his termination with his current allegations about racial slurs); **Russell v. TG Mo. Corp.**, 340 F.3d 735, 747-48 (8th Cir. 2003) (plaintiff who had checked the box for, and had alleged a claim, of disability discrimination could not rely on that claim to show that she had exhausted administrative remedies on her retaliation claim, nor did statement in support of discrimination claim

provide sufficient notice of retaliation claim); **Kells v. Sinclair Buick-GMC Truck, Inc.**, 210 F.3d 827, 836 (8th Cir. 2000) (finding verbal harassment claim was not reasonably related to claims of discriminatory demotion and termination for purposes of exhaustion of administrative remedies).

Disability. Plaintiff has diabetes and a bad back. She alleges she was discriminated against because of these disabilities. As with her claims of sex discrimination, Plaintiff did not include her disabilities in her charge of discrimination, nor did she refer to any disability in her supporting narrative. Moreover, in addition to not having exhausted her administrative remedies on this claim, it is without merit.

Under both the American with Disabilities Act (ADA), 42 U.S.C. § 12101-12213, and the MHRA, Mo.Rev.Stat. § 213.055, it is unlawful for an employer to discriminate against an employee because of a disability. To be disabled under the ADA, an individual must have "a physical or mental impairment that substantially limits one or more of the major life activities of an individual, a record of such impairment, or being regarded as having such an impairment." **Norman**, 606 F.3d at 458. "For ADA purposes, the definition of 'regarded as disabled' assumes that the individual is not actually disabled." **Christensen v. Titan Distrib., Inc.**, 481 F.3d 1085, 1091 n.2 (8th Cir. 2007). The Eighth Circuit considers working to be a "major life activity" under the ADA. **Pittari v. Am. Eagle Airlines, Inc.**, 468 F.3d 1056, 1062 n. 5 (8th Cir. 2006).

To be disabled under the MHRA, a person must have "a physical or mental impairment which substantially limits one or more of a person's major life activities, being regarded as having such an impairment, . . . which with or without reasonable accommodation does not interfere with performing the job . . . ." Mo.Rev.Stat. § 213.010(4). Employment is a "major life activity." **Daugherty**, 231 S.W.3d at 821 n.9 (citing 8 C.S.R. 60-3.060(1)(C)).

Plaintiff's only reference to her "bad back" as a disability was in her deposition. She did not describe any limitations caused by this condition or any reference to or knowledge of her back problems by anyone in Boeing's employ. Rather, Plaintiff focuses on her diabetes as a disability. "A diabetic is not considered disabled per se." **Katoch v. Mediq/PRN Life Support Servs. Inc.**, 2006 WL 516843, * 15 (E.D. Mo. 2006). The only limitation she describes as being caused by the diabetes is her need to take insulin on a timely basis. "'A person whose physical impairment . . . is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not 'substantially limit a major life activity.'" **Id.** (quoting <u>Sutton v. United Airlines</u>, 527 U.S. 471, 482-83 (1999)[14]). Plaintiff has not presented any evidence, or any allegation, that insulin taken on a timely basis does not correct any work-related limitations. Indeed, she offered the note of Dr. Krasnoff that she be allowed to a flexible start time due to her insulin schedule and, if not,

---

[14]<u>Sutton</u> was overruled by amendments to the ADA enacted in 2008, see Pub.L. 110-325, 122 Stat. 3553 (2008), but which did not take effect until January 1, 2009, after the events at issue.

she be allowed to maintain the 7:30 a.m. start time. The evidence is that the 7:30 a.m. start time was indeed Plaintiff's schedule and that it was not varied during the occurrences at issue.

Plaintiff also testified that Floretta did not like it that she had diabetes and would ask her if she needed to take another shot, presumably of insulin. "The 'regarded as' portion of the ADA, which was intended to combat the effects of archaic attitudes about persons with or regarded as having disabilities, is satisfied when an employer mistakenly believes an actual, non-limiting impairment substantially limits one or more of the individual's major life activities." **Kirkeberg v. Canadian Pacific Ry.**, 619 F.3d 898, 906 (8th Cir. 2010) (internal quotations omitted). An employer's awareness of an employee's physical impairments, however, does not establish that the employer regarded the employee as disabled. **Nyrop v. Indep. Sch. Dist. No. 11**, 616 F.3d 728, 736 (8th Cir. 2010). Rather, "'[i]n order to be regarded as disabled with respect to the major life activity of working, the employer must mistakenly believe that the actual impairment substantially limits the employee's ability to work. . . .'" **Id.** (quoting Chalfant v. Titan Distrib., Inc., 475 F.3d 982, 989 (8th Cir. 2007)) (alteration in original); accord **Wisbey**, 612 F.3d at 672-73. There is no evidence that Boeing, and Floretta in particular, believed that Plaintiff's diabetes substantially limited her ability to work. "Regarding an employee as having a limitation that is not itself a disability cannot constitute a perception of disability." **Breitkreutz v. Cambrex Charles City, Inc.**, 450 F.3d 780, 784 (8th Cir.2006). Additionally, the evidence is that Plaintiff's physician

wanted her to maintain the 7:30 a.m. start time if she could not work a flexible schedule. "'[I]f a restriction is based upon the recommendations of physicians, then it is not based upon myths or stereotypes about the disabled and does not establish a perception of disability.'" **Kozisek v. Cnty. of Seward, Neb.**, 539 F.3d 930, 935 (8th Cir. 2008) (quoting Breitkreutz, 450 F.3d at 784); accord **Pittari**, 468 F.3d at 1063. The 7:30 a.m. start time, cited by Plaintiff as evidence of discrimination, does not reflect a discriminatory animus. Nor does an inquiry whether she needed to take a shot, a requirement raised by Plaintiff when her work schedule was discussed, reflect such an animus.

Miscellaneous Motions. Also pending is Boeing's motion to strike Plaintiff's response to its statement of undisputed material facts in support of its motion for summary judgment and Plaintiff's motion for leave to file a sur-reply in opposition to Boeing's reply in support of its motion for summary judgment or, in the alternative, to strike two affidavits submitted with that reply.

When considering the pending motion for summary judgment, the Court considered only evidence that would be admissible at trial, see **Colenburg v. Starcon Int'l, Inc.**, 619 F.3d 986, 993 (8th Cir. 2010); **Nooner v. Norris**, 594 F.3d 592, 603 (8th Cir. 2010), and only relevant arguments supported by that evidence. The allegations and arguments at issue in the two miscellaneous motions were not considered or, if considered, were not determinative. These two motions will be denied.

**Conclusion**

However unfair Plaintiff believes her suspensions and termination to be, she has failed to create a genuine issue of material fact as to whether these actions were taken for an impermissible discriminatory reason. Accordingly,

**IT IS HEREBY ORDERED** that the motion of The Boeing Company for summary judgment is **GRANTED**. [Doc. 62]

**IT IS FURTHER ORDERED** that the motion of the Boeing Company to strike and the motion of Plaintiff for leave to file a sur-reply are each **DENIED**. [Docs. 71, 79]

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  27th  day of April, 2011.